**UNITED STATES of America, Plaintiff,**

v.

**Phillippe Andre SINCLAIR, Defendant.**

**Crim. A. No. 76–56.**

United States District Court,
D. Delaware.

April 22, 1977.

---

James W. Garvin, U. S. Atty., and Jack Beam, Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., for plaintiff.

Morton Richard Kimmel and Paul H. Spiller of Kimmel & Spiller, Wilmington, Del., for defendant.

MURRAY M. SCHWARTZ, District Judge.

Phillippe Andre Sinclair ("defendant") was charged with conspiracy to violate the Federal Mail Fraud Statute, 18 U.S.C. §§ 371, 1341, and the federal statute prohibiting fraudulently inducing persons to travel in interstate commerce as part of a scheme to defraud, 18 U.S.C. §§ 371 and 2314.[1] The defendant also was charged with violations of the substantive offenses described in 18 U.S.C. §§ 1341, 2314. Subsequent to his conviction on all counts submitted to the jury, the defendant moved for judgment of acquittal or, alternatively, a new trial.[2] Those motions presently are before the Court.[3]

## I. The Indictment

On April 28, 1976, the Grand Jury returned a six count indictment against the defendant and Charles Dobson Delcher ("Delcher").[4] The criminal allegations centered around the purchase of a recreation resort in Maryland, known as Great Oaks, by the defendant and two others, J. Wesley Blackwell ("Blackwell") and Thomas Mallan ("Mallan").

The conspiracy count (Count VI) of the indictment alleges that the defendant and Delcher conspired to use the mails to execute a scheme to defraud Blackwell and Mallan. Further, the Count alleges that they conspired to induce Mallan and Blackwell to travel in interstate commerce as part of a scheme to defraud. The scheme to defraud described in the indictment consists of the defendant inducing Blackwell and Mallan to invest more than $22,000 each toward the purchase of Great Oaks. Allegedly, as his role in this scheme, the defendant falsely represented his financial resources and his experience as a manager of a resort area. Delcher's participation in the scheme allegedly was to use his position as Vice-President of Farmers Bank, a Delaware bank, to transfer the money from Blackwell and Mallan to the defendant and to remain silent about any financial problems the defendant had had with Farmers Bank. The indictment alleges as overt acts in furtherance of the conspiracy numerous meetings and conversations between the defendant and Blackwell and Mallan.

The remaining counts in the indictment concern the substantive offenses. Count I alleges that on or about October 10, 1972, the defendant in furtherance of the scheme to defraud placed a letter in the mails addressed to Thomas Mallan. Count II alleges that on or about October 17, 1972, the defendant in furtherance of the scheme to defraud caused a letter to be placed in the mails addressed to the defendant. Count III alleges that on or about October 25, 1972, the defendant and Delcher in furtherance of the scheme caused a letter to be

1. Charles Dobson Delcher was named as a co-conspirator in the indictment and was to be tried jointly with Mr. Sinclair. Just prior to the trial, however, defendant Delcher became quite ill and his trial was postponed. Subsequently, he pleaded guilty to one count of the indictment.

2. See F.R.Crim.P. 29, 33.

3. The briefing of the defendant's reply brief on these motions was delayed twice. On the first occasion, counsel for the defendant simply forgot about the date the brief was due. At the end of the two week extension the Court granted, counsel for the defendant notified the Court that he had encountered difficulty in obtaining a transcript of the trial and would not be able to file a timely reply brief. The Court granted an additional two week extension to the defendant.

4. Count IV of the indictment was dismissed on motion by the United States.

placed in the mails addressed to Blackwell. Finally, Count V alleges that on or about November 4, 1972, the defendant and Delcher in furtherance of the scheme induced Blackwell and Mallan to travel from the State of New York to the State of Maryland.

The trial of the defendant consumed 13 days between September 27 and October 18, 1976.[5] At the close of the Government's case, the Court dismissed Count IV of the indictment on motion of the United States.[6] Motions for judgment of acquittal on the remaining counts were denied.[7] On October 18, 1976, the jury found the defendant guilty on the remaining five counts.[8]

## II. *Motion for Judgment of Acquittal*

As noted above, the defendant has moved for a judgment of acquittal on each of the counts on which he was convicted. Rule 29, F.R.Crim.P. establishes one ground for a judgment of acquittal: "the evidence is insufficient to sustain a conviction . . ." *See United States v. Wolfson*, 322 F.Supp. 798, 806 (D.Del.1971), *aff'd* 454 F.2d 60 (3d Cir.), *cert. denied* 406 U.S. 924, 92 S.Ct. 1792, 32 L.Ed.2d 124 (1972). The elements necessary for conviction are different for each of the statutory violations alleged in the indictment. The requirement common to all is that the Government prove beyond a reasonable doubt the existence of a scheme to defraud. In examining whether there was sufficient evidence for a jury to find a scheme to defraud, it is necessary to initially summarize the evidence introduced at trial.

### A. *The Facts*

In the spring of 1972, the defendant contacted Blackwell, a former prep school classmate.[9] Over the next several months, the defendant spoke with Blackwell on several occasions. In the course of these conversations, the defendant described himself as the successful owner and operator of several businesses, including a computer programming business and a Delaware hotel.[10] The defendant also stated on several occasions that his income was in "six figures." [11]

Late in the summer of 1972, the defendant informed Blackwell that the Great Oaks resort was for sale and he invited Blackwell to view the property.[12] Mrs. Blackwell testified that early in September she received an envelope in the mail containing an appraisal of the Great Oaks property. A few days later, the defendant telephoned her to ask if the appraisal had been received, and to discuss the property and investment opportunity with her.[13]

Early in October, 1972,[14] the Blackwells traveled to Wilmington where they were met by the defendant and driven to Great Oaks. During the weekend, the defendant introduced the Blackwells to the owner of the property, Frank Russell ("Russell"), and a real estate agent, Phillip Widing ("Widing"). The Blackwells toured the property with the defendant and Widing and discussed the possible development of Great Oaks.[15]

At one point, Blackwell expressed concern about his ability to oversee an investment in Maryland while working as a stock salesman in New York. He was reassured by the defendant that he (the defendant)

5. The trial transcript covers almost 2000 pages.

6. Trial Transcript [hereinafter "Tr."] J–110. The different letters preceding each page of the transcript represent the different days of the trial.

7. Tr. K–34.

8. Tr. M–5, 6.

9. Tr. C–169.

10. Tr. C–170–78.

11. Tr. C–179.

12. Tr. C–178.

13. Tr. E–32–34.

14. Blackwell testified that he thought the date was October 5th or 6th. Tr. C–102. However, the first weekend in October, 1972, was the 7th and 8th.

15. Tr. C–182–86.

had hotel experience derived from his operation of a hotel he owned in Puerto Rico. Moreover, the defendant stated that if difficulties arose in connection with the operation of Great Oaks, he would transfer the manager of his Puerto Rico hotel to Great Oaks.[16]

On his return to New York, Blackwell discussed his trip to Great Oaks with Mallan, a close friend. Mallan on the next day, October 9, 1972, traveled to Wilmington, was met by the defendant and driven to Great Oaks. During the trip to Great Oaks, the defendant repeated to Mallan many of the representations concerning his business background that he had made to Blackwell, including that he owned a computer business, the Deer Park Hotel in Newark, Delaware, and the Golden Beach Hotel in Puerto Rico and that his net worth was several million dollars. As with Blackwell, the defendant showed Mallan around the property and introduced him to Russell and Widing. The defendant emphasized his desire to form a partnership to purchase the property and his experience in hotel management.[17]

Two days after Mallan visited Great Oaks, Blackwell and he received letters addressed to "Wes and Tom," each a duplicate of the other.[18] The letter described in rough outline the defendant's suggestions for setting up a corporation to operate the property and for the division of stock. The defendant also referred to a conversation he had had with Mallan regarding strategy in dealing with the owner Russell and asked Mallan to relate the details to Blackwell.

Mallan and his wife drove to Great Oaks on the following Saturday (October 14, 1972) to look at the property. The defend-

ant was not there and the Mallans did not stay overnight.[19]

The next weekend (October 21–22, 1972) Blackwell and his wife and Mallan and his wife went to Great Oaks. The two men met with the defendant and discussed the proposed partnership and division of stock based on the "Wes and Tom" letter. The defendant reassured Mallan and Blackwell of his vast financial holdings and extensive experience in running hotels. During the weekend, Blackwell and Mallan also met Delcher for the first time.[20]

The defendant introduced Delcher as his personal banker and friend. The two gave the outward impression that Delcher and the defendant were good friends, more than just business acquaintances. Delcher toured the property with the three men and emphasized the investment opportunity it presented. At one point, Mallan asked Delcher about the defendant's reputation. Delcher vouched for the defendant's reputation and his good credit standing with the Farmers Bank. The remainder of the weekend was spent discussing the purchase and operation of Great Oaks and the partnership.[21]

A few days after the weekend meeting, the defendant met with Blackwell and Mallan in New York.[22] After further discussion of the purchase of Great Oaks and the further representation by the defendant of his wealth and hotel experience, the defendant suggested that they would need $50,000 as operating capital to run Great Oaks ($16,666 from each partner) and $6,000 from each of them to be placed in an escrow account as the down payment for Great Oaks. Subsequently, Mallan and Blackwell

---

**16.** The purported manager, Frank Hoogland, testified that he had never worked for the defendant in Puerto Rico and that the defendant had been unsuccessful in his attempt to purchase the Golden Beach Hotel. (Tr. E–131) *See* text *infra* at p. 1188.

**17.** Tr. E–68–73.

**18.** GX 35, GX 91. Since the author wrote one letter and simply sent it to two persons, it will be referred to in the singular. The admissibility of the letter is discussed *infra*.

**19.** Tr. E–91.

**20.** Tr. E–92–3.

**21.** Tr. E–93–8.

**22.** Other evidence, discussed *infra*, strongly indicates that this meeting took place in New York on October 24, 1972.

each gave the defendant a check for approximately $16,666 payable to the defendant and a check for $6,000 payable to Sinwellan Corporation.[23] Mallan testified that he left the date on his checks blank, but he was sure he completed them on October 25, 1972 (Wednesday following the weekend meeting at Great Oaks).[24] Blackwell's cashier's checks, issued by Morgan Guaranty Trust, are also dated October 25, 1972. (GX 39, 40)

The defendant received from each authorization to act as their agent in the purchase of Great Oaks.[25] Both men testified that although the authorizations were dated October 17, they actually were drafted about a week after that and were back dated. The apparent purpose was to provide proof to Russell that the defendant had authority to negotiate on behalf of Mallan and Blackwell and had had that authority from the beginning of the negotiations.[26]

On October 31, 1972, a contract for the sale of Great Oaks was signed by Russell, as seller, and the defendant, on behalf of Blackwell, Mallan and himself, as buyers.[27] The following week-end (November 4–5, 1972), Mallan and Blackwell and their wives drove from New York to Great Oaks. The defendant had arranged an afternoon cocktail party for members of the local press and a few real estate people to meet the new owners of Great Oaks. Delcher was also present and, in fact, tended bar during the afternoon.[28]

Two weeks later, on November 18–19, 1972, the Mallans and Blackwells returned to Great Oaks, accompanied by Stuart Simel ("Simel"), Mallan's corporate accountant. A heated dispute developed between the defendant and Simel, especially concerning the failure of the defendant to put up any money. The discussion among the men continued throughout Saturday. The next morning the defendant approached the Mallans and Blackwells at breakfast and declared that there was not room for all three in the corporation and either he would buy out Mallan and Blackwell or they should buy out him.[29]

After their return to New York, Mallan and Blackwell were unable to resolve the difficulty with the defendant. Mallan had his New York attorney draft an agreement providing for the defendant's purchase of the interest of Mallan and Blackwell in Great Oaks. The purchase price was left blank. The following day Mallan and Blackwell traveled to Wilmington where they met with the defendant and his attorney.[30] The buy-out was discussed and the defendant suggested a purchase price of $90,000, approximately double the initial investment of the two New York partners. The defendant's attorney produced a promissory note in the amount of $90,000 which the defendant executed. In exchange for the defendant's promise to pay them $90,000, Mallan and Blackwell surrendered all their interest in Great Oaks and their initial investment of $45,000.[31]

## B. Scheme to Defraud

The foregoing is an outline of the facts presented by the Government to show a conspiracy between the defendant and Delcher. On a motion for judgment of acquittal, the evidence must be examined in the light most favorable to the Government and it must be given the benefit of the inferences to be drawn therefrom. *United States v. Trotter*, 529 F.2d 806, 810 (3d Cir. 1976); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The core of the Government's case is that the

---

**23.** Tr. D–63–4, E–99–104, 110; GX 32, 33, 34, 39, 40.

**24.** Tr. E–112.

**25.** GX 37, 38.

**26.** Tr. D–67; E–113.

**27.** GX 53; Tr. C–110.

**28.** D–70–2; E–121–23.

**29.** Tr. E–124–127.

**30.** A different attorney has represented defendant in this proceeding.

**31.** Tr. E–128–29; J–55–7.

defendant induced Mallan and Blackwell to part with their money on the basis of the defendant's false representations of his wealth and hotel experience and that Delcher acted in concert with him in this enterprise. The Assistant United States Attorney representing the Government in this case indicated at one point that the defendant never intended to purchase Great Oaks.[32] The indictment, however, does not allege and the evidence does not demonstrate that the defendant never had that intention. Indeed, the evidence shows that a contract for the purchase of Great Oaks was signed on October 31, 1972.[33] What the indictment does allege is that the defendant defrauded Blackwell and Mallan by inducing them to enter into a partnership with him and to put up over $45,000 for the purchase of Great Oaks on the basis of false and misleading representations. The defendant contends that there simply is insufficient evidence to support a finding that there was a scheme to defraud.

The scheme to defraud charged in the indictment consists of two categories of related but analytically distinct misrepresented facts: (1) those involving the defendant's wealth; (2) those involving the defendant's experience in running a hotel. Witnesses testified to a myriad of representations by the defendant as to his vast wealth: that he owned the Golden Beach Hotel in Puerto Rico (Tr. E–71); that he owned the Deer Park Hotel in Newark, Delaware (Tr. E–70–1); that he owned a successful computer business (Tr. C–171); that he owned a successful business (Kimclair, Inc.) which operated a parking lot in Newark, Delaware. (Tr. C–174) Various witnesses testified to still other claims of wealth made by the defendant,[34] but the Government need not prove every representation alleged in the indictment or testified to by witnesses was false. The proof must be sufficient to show the existence of the scheme. *See United States v. Joyce*, 499 F.2d 9, 22 (7th Cir.), *cert. denied* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); *Schaefer v. United States*, 265 F.2d 750, 753–54 (8th Cir.), *cert. denied* 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959).

To prove the falsity of the defendant's claim of a successful computer business, the Government introduced the testimony of David Copley ("Copley") and certain documentary evidence. Copley testified that he worked as a Vice President of the Computer Institute of North America ("CINA") and that the defendant was President of CINA. He further testified that after his short employment as Vice-President (four weeks), he left CINA and the assets of CINA later were sold at a Sheriff's sale. The Government introduced into evidence documentary proof of the sale of the assets of CINA in March, 1971.[35] The Government also introduced a certificate of the Delaware Secretary of State attesting that CINA was no longer in existence as a corporation under the laws of Delaware "having become inoperative and void the fifteenth day of April, A.D. 1972, for non-payment of taxes. . . ."[36] The Court finds that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant knowingly misrepresented to Mallan and Blackwell,[37] among others, that he was the owner of a successful computer business.

During the summer of 1972, as the defendant was developing his relationship with the Blackwells, he gratuitously offered Blackwell part interest in a computer program. The defendant later told Blackwell that he had sold the program and wanted to invest the money in a parking lot in Newark, Delaware. Blackwell agreed and the defendant sent him a certificate purported-

32. Tr. K–19. *See, infra*, p. 1190 and n. 53.

33. GX 53.

34. These included the claim that he was an heir to the Sinclair oil fortune and that he received royalties from a patent relating in some way to television commercials. Tr. G–9; D–160.

35. GX 103.

36. GX 109.

37. Tr. C–170–72; E–71.

ly representing 210 shares in Kimclair, Inc., the company the defendant said he set up to own the parking lot.[38] Several months later, in October, 1972, the defendant told Blackwell that his shares were worth $21,000 or $100 per share.[39] To prove the misrepresentation by the defendant, the Government introduced a certificate from the Delaware Secretary of State attesting that Kimclair, Inc. was no longer in existence as of April 15, 1972, due to its non-payment of taxes.[40] Since the representations were made by the defendant during the late spring and early summer of 1972 and the stock certificate given to Blackwell is dated June 9, 1972, this Court holds that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant knowingly misrepresented that he was the owner of a successful company known as Kimclair, Inc.

The issue of the defendant's ownership of the Golden Beach Hotel and the Deer Park Hotel concern both his claims of wealth and experience in running a resort like Great Oaks. Both Mallan and Blackwell emphasized the importance to them of the defendant's alleged hotel experience.[41] The Government sought to disprove these claims of ownership and experience through the testimony of Frank Hoogland ("Hoogland") and certain documents.

Hoogland testified that he met the defendant in late 1971 or early 1972 while the latter was staying at a hotel in Puerto Rico in which Hoogland owned an interest. According to Hoogland, the defendant never indicated that he owned any property in Puerto Rico but the defendant did attempt to purchase the Golden Beach Hotel during late 1971 or early 1972 and enlisted the aid of Hoogland in pursuing the sale. Hoog-

land testified that he discussed the purchase with certain persons at a meeting held at the Golden Beach Hotel. After a subsequent meeting in New York, which Hoogland apparently did not attend, the defendant telephoned Hoogland and told him that the purchase of the Golden Beach Hotel had not gone through.[42]

As noted earlier, on his first visit to Great Oaks in October, 1972, Blackwell was reassured by the defendant that he (the defendant) had acquired hotel management experience from running the Golden Beach Hotel and that if he ran into trouble in operating Great Oaks, he would bring up his manager at the Golden Beach, Frank Hoogland. Hoogland testified that he never worked for the defendant in Puerto Rico.[43] From this testimony, the Court holds that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant during 1972 knowingly misrepresented his ownership of and experience in running the Golden Beach Hotel in Puerto Rico.

Finally, the Government attempted to disprove the defendant's claimed ownership of the Deer Park Hotel in Newark, Delaware. The Government offered into evidence the Annual Reports submitted by the owner of the Deer Park Hotel, Deer Park Hotel, Inc., during 1972 and 1973.[44] Those documents show that the defendant was not an officer or director of the corporation owning the hotel. The Government also introduced a deed of sale which reflected that the hotel had been sold in 1958 to Deer Park Hotel, Inc.[45] The Court finds this evidence is insufficient to prove that the defendant did not own the Deer Park. The government failed to produce a list of the shareholders of the corporation, for conceivably the defendant could have been the

---

38. Tr. C–171–73; GX 42.

39. Tr. D–130; GX 43. The defendant made this statement when asked by Blackwell what value should be given to the stock on Blackwell's financial statement. This occurred around the time Blackwell gave the defendant checks totaling $22,666.66. *See* text *infra* at 1194.

40. GX 48.

41. Tr. C–184–85; E–73.

42. Tr. D–156–61; E–13–16. The defendant hired Hoogland in late 1972 to manage Great Oaks.

43. Tr. C–185; D–161.

44. GX 97, 98, 99.

45. GX 100.

majority stockholder without being an officer or director. Although there was insufficient evidence produced from which a jury could find beyond a reasonable doubt that the defendant falsely represented his ownership of the Deer Park Hotel, this conclusion does not necessarily require a judgment of acquittal on all counts.

What must be proven in order to sustain a conviction is that there was a scheme to defraud. *See United States v. Joyce, supra,* 499 F.2d at 22. The Court finds that the evidence of misrepresentation by the defendant as to his successful operation of CINA, Kimclair, Inc. and ownership of and experience in running the Golden Beach Hotel provides a sufficient basis for a jury to find a scheme to defraud. The proof demonstrates that the defendant embarked upon a clever and sophisticated scheme to convince Mallan and Blackwell of his wealth, business acumen and hotel management experience in order to entice them into a partnership with him for the purchase of Great Oaks. The above noted testimony of the two men from New York makes it clear that they relied heavily on those representations in making their decision to invest in the venture.

The defendant urges that there was no scheme to defraud because the value of Great Oaks was not misrepresented and because the defendant never waivered from his intent to purchase the property in partnership with Mallan and Blackwell. The Court agrees that there was no deception as to the value of the land, but that conclusion does not dispose of this case.[46] The essence of the scheme was to convince Mallan and Blackwell that the defendant was a man of wealth and experience, that he was a man in whom they could place their trust and their money and who had the experience to operate the property they were purchasing so as to induce them into partnership with him. The fundamental inducements to Mallan and Blackwell to enter into this deal were the misrepresentations of the defendant; those misrepresentations constituted the scheme to defraud.

The defendant relies heavily on *United States v. Regent Office Supply Co.*[47] but the case is inapposite. That case holds that solicitation of a purchase by means of false representations not directed to the quality, adequacy, or price of the goods to be sold or otherwise to the nature of the bargain does not constitute a scheme to defraud within the meaning of 18 U.S.C. § 1341.[48] In the instant case, by contrast, the misrepresentations by the defendant were directed to the bargain to which Mallan and Blackwell believed they had assented. That is, they believed that they had invested in a hotel resort with a man who had substantial wealth and who had the experience to operate the property while they tended to their business interests in New York.[49] This situation is different from *Regent Office Supply* where the bargain solely involved a sale of goods and the misrepresentation consisted of false reasons for being able to offer the bargain. There was no proof that the goods were not equal to the value paid, nor did any customer testify that he was cheated.[50]

At bottom, the difference between *Regent Office Supply* and this case is that in the former, the Government established that certain false representations had been made by the defendant, but failed to show that any injury or possibility of injury to the alleged victims could have resulted from the misrepresentation. Stated briefly, the Government showed an intent to deceive, but not an intent to defraud. In the case at bar, the Government has established

---

**46.** Whether the property was in fact worth the $1,600,000 price (GX–53) need not be resolved in this case; there was no evidence of the defendant's misrepresentation of its value.

**47.** 421 F.2d 1174 (2d Cir. 1970).

**48.** *Id.* at 1179.

**49.** There was testimony that approximately $33,000 of the $45,000 invested by Mallan and Blackwell was earmarked to be used for initial operating costs and thus went to the operation of the investment property rather than its purchase. Tr. E–102.

**50.** *Id.* at 1182.

an intent to defraud because the falsity of the representations has been shown to have affected Mallan's and Blackwell's understanding of the bargain and to have influenced their assessment of the value of the bargain to them.[51] Thus, here, unlike *Regent Office Supply,* injury was shown to have derived from the deception.

The argument that there was no scheme to defraud because the defendant always intended to purchase Great Oaks is similarly without merit.[52] As noted above, this scheme to defraud was not the simple attempt to exchange valueless goods for money, or, in this case, to purchase worthless property. The deception concerned another part of the bargain, but nonetheless an important one to those investing their money and entrusting the operation of the hotel: the defendant's qualifications as a partner and manager. The presence of an intent to purchase is irrelevant to the scheme to defraud as it appears in the context of this case.[53]

## C. *Conspiracy Count*

Having found a scheme to defraud, the defendant's contention that there was insufficient proof of a conspiracy to defraud for the jury to convict him must be ad-

dressed. There appear to be two prongs to this assertion: (1) that the evidence independent of the statements by the alleged co-conspirator Delcher did not demonstrate any conspiracy; (2) that all the evidence introduced at trial, including Delcher's statements, was insufficient to prove a conspiracy to defraud.[54] These theories will be treated separately.

Under the Federal Rules of Evidence, out-of-court declarations by a co-conspirator are not hearsay. *See* Rule 801(d)(2)(E) F.R.E. Such statements, however, are only admissible if made: 1) in furtherance of the conspiracy; 2) during the conspiracy; 3) by a co-conspirator.

■ Subsumed within the first prong of defendant's argument is the position that the Court erred in admitting evidence of Delcher's statements. This contention may seem more appropriate to a motion for new trial under Rule 33, F.R.Crim.P. In this case, however, the prosecution was permitted to avoid the usual requirement of establishing the conspiracy by sufficient independent evidence before offering the co-conspirator's testimony.[55] The Court, in its discretion, may allow this procedure if the Government represents, as it did in this case, that strict adherence to the normal

51. *See id.*

52. Defendant emphasizes in his brief that he spent much of his own money to cover costs in connection with the purchase and initial operation and thus there was no scheme to defraud. This evidence might be relevant if the issue in the case were whether the defendant sought to buy the property or just wanted to get money from Mallan and Blackwell. But this Court has noted above its conclusion that the defendant did intend to buy Great Oaks. Further, the references to the transcript in support of his contention that he spent much of his own money consist of questions asked of the Government's witnesses on cross-examination. The answers of the witnesses do not support the conclusion urged by the defendant in his brief.

53. At oral argument on defendant's post-trial motion for judgment of acquittal or new trial, the defendant belatedly argued that he had been denied due process on the ground that his defense had been constructed around the prosecution's theory that there never was any intent to purchase Great Oaks. The defendant's only reference to a Government statement of

this theory is to page K–19 in the trial transcript. The statement was made after the close of the Government's case at argument on defendant's initial motion for a judgment of acquittal. To the extent that the defendant is contending that he was prejudiced in cross-examining the Government's witnesses because of the supposed theory, that argument is without merit since the Government did not mention the absence of intent to sell in its opening statement and the theory was not articulated until after all the witnesses had testified. To the extent that the defendant is contending that the presentation of his own case was prejudiced, that argument is similarly without merit. The defendant did not ask for a continuance in light of the prosecution's statement and Court's explanation of its basis for denying the initial motion for judgment of acquittal. Instead, the defense immediately rested. Therefore, the Court finds no deprivation of due process.

54. Defendant's Opening Brief at 3.

55. Tr. C–16.

evidentiary foundation would disrupt the logical presentation of its case and confuse the jury.[56] *See United States v. Vespe,* 389 F.Supp. 1359, 1369 (D.Del.), *aff'd* 520 F.2d 1369 (3d Cir. 1975), *cert. denied* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976). This Court fairly warned the Government that should the United States fail to establish at the close of its case the requisite foundation for admitting the co-conspirator's testimony, a mistrial would be declared and the defendant would not be subject to a new trial on the charges.[57] If the Court should decide that the co-conspirator's testimony was admitted improperly, the consequence would be a judgment of acquittal. Accordingly, it will be examined by the Court as part of the motion for judgment of acquittal.

The requirements that the statement be made during and in furtherance of the alleged conspiracy are easily met by the evidence introduced at trial. All of the statements were made immediately prior and subsequent to the purchase of Great Oaks by the defendant, Mallan and Blackwell. Similarly, if sufficient independent evidence of Delcher's participation has been established, there can be little doubt that the statements, all related in some way to the purchase of Great Oaks, were made in furtherance of the conspiracy. *See Krulewitch v. United States,* 336 U.S. 440, 442, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *United States v. Trotter,* 529 F.2d 806, 813 (3d Cir. 1976); *cf. United States v. Weber,* 437 F.2d 327 (3d Cir. 1970), *cert. denied* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); *see generally* Developments in the Law—Criminal Conspiracy, 72 *Harv.L.Rev.* 920, 985 (1959).

1. *Independent Evidence of Conspiracy*

The third requirement that the statement be made "by a co-conspirator" presents a closer and more perplexing question. The defendant contends that evidence of Delcher's participation in a conspiracy, independent of Delcher's own statements, was insufficient to sustain the burden imposed by the Third Circuit as a condition to admitting the statements. As the Court indicated in its ruling on the defendant's motion for judgment of acquittal at the close of the Government's case, it believes there is some uncertainty in the Third Circuit as to what must be shown as a condition to admitting the statements of an alleged co-conspirator.[58]

At the outset, the distinction should be noted between the crime of conspiracy and the admissions of the testimony of a co-conspirator against a non-declarant.[59] To convict a person under the federal conspiracy statute, the Government must show a meeting of the minds, criminal intent and an overt act. *See United States v. Trowery,* 542 F.2d 623, 626 (3d Cir. 1976). The admissibility of statements by a co-conspirator concerns primarily a joint enterprise or a concert of action between the declarant and non-declarant. *See id.* at 626–27. Therefore, conspiracy need not even be charged in the indictment in order to admit co-conspirator statements. *Id.*

The precise issue raised by the instant case is whether the independent evidence of Delcher's relationship with the defendant must demonstrate by a clear preponderance that a conspiracy existed between the two men or that a joint venture existed.[60] The uncertainty is generated by the different characterizations of the test found in Third Circuit cases. *United States v. Bey,* 437 F.2d 188 (3d Cir. 1971), a leading case on this issue, states that the independent evidence must show a "likelihood of an illicit association. . . ." *Id.* at 190. The

**56.** Tr. C–3.

**57.** Tr. C–15–17.

**58.** Tr. K–29–34.

**59.** Cases on this question refer to the ground for admitting such testimony as the co-conspirator exception to the hearsay rule. The new Federal Rules of Evidence clearly exclude co-conspirator testimony from the definition of hearsay. F.R.E. 801(d)(2)(E).

**60.** The issue of the quantum of proof required of the Government was answered in *United States v. Trotter,* 529 F.2d 806, 812 (3d Cir. 1976).

Court went on to find that there was "sufficient independent evidence of a conspiracy to permit admission of the co-conspirator's statements." *Id.* at 192. The *Bey* court cited with approval similar language in two Second Circuit cases. *United States v. Geaney,* 417 F.2d 1116, 1119–20 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968).

More recently, in *United States v. Trowery, supra,* this Circuit seems to have relaxed the burden of proof. The *Trowery* court characterized the threshold requirement as proof that "a joint undertaking existed at the time of the statement or action . . ." citing *United States v. Geaney.* This characterization noticeably omits any qualification that the joint undertaking be for a criminal purpose. The *Geaney* case also refers at several points to a "concerted mutual venture" without specifying a criminal purpose. *United States v. Geaney, supra,* 417 F.2d at 1119, 1121. Similarly, the *Bey* case speaks of the need to find the existence of a "joint undertaking." *United States v. Bey, supra,* 437 F.2d at 191; *see also United States v. Ragland, supra,* 375 F.2d at 477.

Perhaps the reason that this difference in language has not been highlighted is that the conspiracies involved in the cases cited above differ markedly from the instant case. A conspiracy may consist of an agreement by two or more persons to accomplish an illegal goal or an agreement to accomplish a legal goal by an illegal method. *See United States v. Perlstein,* 126 F.2d 789 (3d Cir.), *cert. denied,* 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942). All of the cases referred to above concerned conspiracies to accomplish an illegal goal: *United States v. Ragland, supra* (conspiracy to transport narcotics); *United States v. Geaney, supra* (conspiracy to rob a bank); *United States v. Bey, supra* (conspiracy to distribute cocaine and heroin); *United States v. Trowery, supra* (conspiracy to distribute heroin). Therefore, proof of a joint enterprise to accomplish the illegal goal in-

herently established a criminal purpose. The case at bar, by contrast, involves a scheme to accomplish a legal goal (formation of a partnership for the purchase of Great Oaks) by illegal means (fraudulent misrepresentation about the defendant's wealth and hotel experience). Proof of Delcher's participation leading to the formation of the partnership and purchase of Great Oaks by defendant, Mallan and Blackwell does not necessarily also prove his knowledge and support of the illegal means employed by the defendant. Therefore, proof of a "joint venture" between Delcher and the defendant does not unavoidably constitute proof of a conspiracy.

While acknowledging uncertainty, it is held that where as here the conspiracy is to accomplish a legal goal by illegal means, the Government must meet the more rigorous test. That is, for the purposes of determining the admissibility of Delcher's co-conspirator statement, the Government must demonstrate by a clear preponderance of the evidence that Delcher and the defendant conspired to defraud Mallan and Blackwell.

Obviously, it is difficult to separate neatly and assess impartially the independent evidence utterly "free from the color shed upon it by the hearsay." *United States v. Geaney, supra,* 417 F.2d at 1120. Nevertheless, that is the mandate of this Court for "[o]therwise, hearsay would lift itself by its own bootstraps to the level of competent evidence." *Glasser v. United States,* 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). The following is a description of the independent evidence introduced in this case to show Delcher's knowledge and participation in a conspiracy with the defendant.

During the summer of 1972, Delcher, a vice-president in the Consumer Loan Department, was assigned by the Farmers Bank to monitor the defendant's account with the Bank. (Tr. I–74) Delcher had first dealt with Sinclair when he was assigned to handle Farmers Bank's loans to students enrolled in CINA, the computer business defunct by June, 1972. (GX–109;

Tr. G–56) More specifically, the evidence shows that in June, 1972, Delcher worked out a compromise with the defendant and his mother to settle the defendant's claims that the Farmers Bank had misapplied funds and made errors in the defendant's accounts with the Bank. (Tr. I–62–3, 75; DX–1) As part of the compromise, the defendant was given a $10,000 line of credit for which his mother co-signed. (Tr. I–62–3; DX–1; GX–9; GX–92) The Bank's ledger card and the testimony of James D. Weiss, Jr., Vice President of Farmers Bank, reflect that money was not to be advanced on the line of credit without the prior approval of Delcher. (GX–92; Tr. I–63)

During the month of October, 1972, as the deal to purchase Great Oaks was being formed, Delcher appeared prominently. On the weekend of October 21, 1972, the first time Blackwell, Mallan and the defendant met together, Delcher also arrived at Great Oaks. (Tr. E–94) Delcher was introduced to Mallan, Blackwell and others as a close friend and advisor as well as the defendant's banker. (Tr. E–93–4; D–35–6; C–109–10) The four men toured the property together in Mallan's car. During the tour and in Delcher's presence, the defendant again spoke of his experience in managing the Golden Beach Hotel. With Delcher present, Mallan, Blackwell and the defendant also discussed the value of the property and how much money would have to be invested. (Tr. E–94) Subsequently, Mallan and Blackwell each gave Delcher a financial statement reflecting his current assets and liabilities. (Tr. D–50; E–170) Blackwell testified that he requested and received the financial form from Delcher. (Tr. D–45, 48–9) On the defendant's next trip to New York, when he met with Mallan and Blackwell to work out the financial details of the deal, the defendant represented that Delcher would insure that there were no prob-

lems with financing the purchase of Great Oaks. (Tr. E–109)

Delcher also attended the November 4th gathering to introduce the new owners to the press. As with the earlier trip, the defendant told the Mallans and Blackwells that Delcher would be coming. (Tr. E–93, E–121) At the press party, Delcher rolled up his sleeves and tended bar. (Tr. E–122).

On one of his trips to Great Oaks, Delcher brought with him a Master Charge application.[61] The purpose was to set up a credit arrangement between Great Oaks and Farmers Bank so that customers of the resort could charge their bills. (Tr. E–123)

After Mallan and Blackwell turned over to the defendant their respective checks in the amounts of $16,666 and cents and $6,000, the defendant deposited the checks with the Farmers Bank, for the evidence shows that on October 27, 1972, Farmers Bank wired Morgan Guaranty Trust Company in New York for collection of Blackwell's check of $16,666.66. (GX–40; GX–3A; Tr. I–40–1) On November 1, 1977, Farmers Bank wired Bankers Trust in New York for collection of Mallan's check of $16,666.67. (GX–33, GX–5, GX–6; Tr. I–41–2) When the money from the checks was collected it was deposited in an "interoffice account" by Delcher.[62] (GX–3A, GX–5)

On November 3, 1977, Delcher applied $7300 of the $33,333.33 deposited in the inter-office account against the June 26, 1972 line of credit granted to the defendant. (GX–92, GX–9, GX–10; Tr. H–29; I–42) This transaction reduced the balance owing on the line of credit to zero. On the same day, an advance of $7650 against the June 26th line of credit was made to the defendant.[63]

■ The independent evidence introduced at trial did not prove the existence of

---

**61.** There is a difference in the testimony as to whether this occurred during the November 4th weekend (Tr. E–123) or the weekend of November 18th (Tr. D–75, E–47).

**62.** An inter-office account is designed to permit "the movement of paper funds from one area of the bank to another." Tr. I–41.

**63.** Evidence at trial showed that the conspiracy ended on November 22, 1972, when Mallan and Blackwell exchanged their interest in Great Oaks for a promissory note.

a conspiracy beyond any shadow of a doubt; in the vernacular of recent history, the Government did not produce a "smoking gun." But that is not the Government's burden. The conspiracy may be shown by independent circumstantial evidence and such evidence need not be inconsistent with "all reasonable hypotheses of innocence" to permit introduction of the hearsay. *United States v. Ragland, supra*, 375 F.2d at 477. This is not to say that mere association with an alleged conspirator is sufficient. What the evidence must show by a clear preponderance is that Delcher in some way associated himself with the venture and sought to bring it to a successful conclusion. *See United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938).

The independent evidence demonstrates that Delcher was intimately familiar with the defendant's unstable financial condition during 1972. Indeed, Delcher (or the Bank) had taken the precaution of requiring the defendant's mother to co-sign the June, 1972 loan.[64] Further, the evidence shows that Delcher was quite aware of the deal to purchase Great Oaks and knew how the defendant was enticing Mallan and Blackwell into a partnership. Delcher made at least two trips to the resort in October and November, 1972, including the only occasion the three parties met on the property to discuss the transaction prior to the execution of the contract to buy Great Oaks. He was present in Mallan's car during the tour of the property when the defendant again represented his extensive hotel experience from running the Golden Beach. Moreover, he knew the emphasis the defendant was placing on his close personal and business relationship with Delcher in introducing him to Mallan and Blackwell. Finally, there were the statements by the defendant that Delcher would arrange for the financing of the property and the testimony of Mallan and Blackwell that each gave Delcher a financial statement listing his assets and liabilities. All of this evidence confirms Delcher's knowledge of the agreement being struck and his role in ensnaring Mallan and Blackwell.

■ The Court finds it a reasonable inference from this evidence that Delcher was associated with the defendant's scheme to entice Mallan and Blackwell into a partnership in order to purchase Great Oaks and sought to bring the arrangement to a successful conclusion the evidence of Delcher's actions [65] in connection with the checks of Mallan and Blackwell underscores the close scrutiny the banker was giving to the defendant and his business deals. Notwithstanding that Delcher was in the Consumer Loan Department and not responsible for checking or savings accounts, the proceeds of the checks were quickly collected from the New York drawee banks, deposited in an inter-office account controlled by Delcher, and $7300 was immediately applied to reduce the balance owed on the June, 1972, loan to zero.[66] On the same day, Delcher approved an advance of $7650 against the same loan and the defendant picked up the money. The evidence clearly indicates that the defendant was aware of what was going on, for he told a cashier at the bank that Delcher would call to approve the issuance of the checks. (Tr. J–67–8) Further, the defendant knew that $7300 had been advanced against the June loan previously

---

**64.** The purpose of a co-signer was to assuage concerns about the defendant's credit stability. Tr. J–24.

**65.** *See* pp. 1194, 1195 and n. 66 *infra*.

**66.** The Government has not suggested a motive for Delcher's participation in the scheme and it need not in this case. Certain of the evidence, however, does imply such a motive. On November 3, 1972, as noted above, Delcher applied part of the Blackwell and Mallan funds to pay off the defendant's loan. The remaining $26,033.33 was kept in the inter-office account

by Delcher until January 4, 1973. (Tr. I–52) On that date, a savings account in the name of the defendant was set up by Delcher with himself named as trustee. (Tr. I–43; H–33–4) The $26,033.33 was deposited into the savings account. (Tr. I–43) The November and January bank transactions, however, at least suggest that Delcher may have been attempting to protect the position of the Farmers Bank with respect to the defendant's loan liability and thereby protect his (Delcher's) own position at the Bank.

and thus he could not receive an additional $7650, at least until the balance had been reduced. (GX–92) [67]

It is concluded that the Government has shown by a preponderance of the evidence independent of Delcher's statements the "likelihood of an illicit association," that is, that a conspiracy existed between Delcher and the defendant to defraud Mallan and Blackwell at the time of the statements or actions. *United States v. Bey, supra,* 437 F.2d at 190.

### 2. *Insufficient Evidence of Conspiracy*

■ Having found that the statements by Delcher were admissible, the Court need not decide whether there was sufficient evidence to support a verdict of guilty without the statements of the alleged co-conspirator. What must be addressed is whether all of the evidence introduced, including Delcher's statements, was sufficient to find the defendant guilty of conspiracy. *See United States v. Bey, supra,* 437 F.2d at 190.

In addition to the evidence described above, the Government introduced through witnesses many statements by Delcher to show his participation in the defendant's scheme to defraud. The following examples are by no means exhaustive. Perhaps the most revealing evidence was Mallan's testimony about a conversation he had alone with Delcher during the weekend of October 21, 1972. In response to Mallan's inquiries about the defendant and his desirability as a business partner, Delcher strongly vouched for the defendant and his financial resources. (Tr. E–96–7) Indeed Delcher even stated that the defendant's mother was a director of Farmers Bank. (Tr. E–97) Weiss later testified that Mrs. Thompson, the defendant's mother, was not a director in 1972. (Tr. J–20–1) Delcher also declared that he could take care of the financing, which Mallan assumed meant that Farmers Bank would provide the financing. (Tr. E–97) These statements were made by Delcher at a time when he knew that Farmers Bank thought the defendant sufficiently unstable as a credit risk for $10,000 that a co-signer was required and that $6,300 of the $10,000 loan had been advanced.

Subsequently, Delcher asked Mallan for a financial statement and Mallan complied. (Tr. E–170) Likewise, Delcher asked Blackwell for a financial statement, but Blackwell was unfamiliar with the procedure. At his request, Delcher supplied a form, which Blackwell completed and returned. (D–45, 47–50, 60)

The Court finds that this evidence, when placed in the context of the scenario described earlier, is sufficient for a jury to have found beyond a reasonable doubt that there was a conspiracy between the defendant and Delcher to defraud Mallan and Blackwell.

### D. *Substantive Counts*

### 1. *Count I*

Count I of the Indictment accused the defendant of using the mails to execute his scheme to defraud by placing or causing to be placed in the mails an envelope addressed to Mallan containing a letter dated October 10, 1972. (GX–91) The defendant at trial objected to the introduction of this letter, as well as the copy received by Blackwell (GX–35) on the grounds that authenticity had not been established and the letter was irrelevant because of insufficient proof of mailing by the defendant.[68] It is unclear from defendant's briefs whether he is renewing only the latter point or both of the points, however, the Court will consider both points to have been raised by his current motions.

■ The authenticity of a letter can be established in several ways. *See* F.R.E. 901(b). No one testified that he saw the defendant write the letter, nor did the

---

**67.** There is some conflict in the record about exactly what kind of credit the June, 1972 loan extended to the defendant. Some evidence indicates that it was a line of credit. (DX–1) Other evidence indicates that it was a simple demand loan. (GX–9) The resolution of this dispute is not necessary to this decision.

**68.** Tr. D–19–20; E–75.

Government attempt to establish that the signature on the copies was the defendant's. Circumstantial evidence, however, may be used to establish authenticity. *See United States v. Sutton,* 138 U.S.App.D.C. 208, 426 F.2d 1202 (1969). Proof of authorship need not be beyond a reasonable doubt in order to warrant admitting the document. The Third Circuit requires that a prima facie case of the author's identity be established for a writing to be admissible. The ultimate issue of authorship and probative weight is for the jury. *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 192 (3d Cir. 1970), *cert. denied* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971).

■ There are several circumstantial indicia of the defendant's authorship of the letter which justified its admission into evidence. First, the letterhead on the stationery contained the defendant's name and a post office box in Christiana, Delaware. *See* 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(b)(4)[2] (1975). Second, the letter was dated the day after Mallan's visit to Great Oaks and received by Mallan and Blackwell two days later. The letter discusses various aspects of the proposed partnership, including the stock split among the principals [69] and expressly refers to the defendant's recent conversation with Mallan and their agreement on a proposed course of action in dealing with Russell.[70] Finally, the letter formed the basis for subsequent discussions among Blackwell, Mallan and the defendant.[71] The letter was shown to the defendant, put on the table and the three men used the stock split suggested in the letter as a basis for the discussion. Based on all of these circumstances, the Court finds that the Government met its burden of a prima facie showing and the letter received by Mallan and Blackwell was properly admitted.

■ The defendant's other contention is that the evidence of mailing was insufficient to support a conviction, citing *United States v. Wolfson, supra.* The law in this district is quite clear: A conviction under 18 U.S.C. § 1341 must be supported by evidence either direct or circumstantial that the defendant placed or caused to be placed a letter in the mails. *See United States v. Wolfson, supra,* 322 F.Supp. at 811–12. Even if there is evidence that a person authored a letter, the mere receipt of the letter through the mails is an insufficient basis to find that the author placed it or caused it to be placed in the mails. *Id.* at 812.

■ The Government elicited direct testimony from Mallan of the receipt of the letter in the mails. (Tr. E–83–5) The defendant contends that the evidence in this case shows only the receipt of a letter purportedly authored by the defendant. The Court agrees that if the sole evidence before it were Mallan's testimony of receipt, the defendant should be acquitted on Count I. But there was more. The additional facts closely parallel the evidence relied upon by Chief Judge Latchum in the *Wolfson* case to find sufficient evidence of mailing. *See United States v. Wolfson, supra,* 322 F.Supp. at 812. In *Wolfson,* the Court singled out three important facts: (1) the letter at issue was received after the recipient had sent a letter requesting a written confirmation of his authority; (2) at a later meeting between the alleged sender and recipient, the sender added a hand written notation to the letter; (3) at the meeting, the sender never denied having sent the letter. *Id.*

In the instant case, as noted above in the discussion of the letter's authenticity, the letter, with the salutation, "Dear Wes and Tom," arrived during the week following

---

**69.** The letter indicates that Widing was to receive some stock, apparently in lieu of a cash commission. This suggestion was subsequently rejected. Tr. D–13.

**70.** Since Mallan met the defendant for the first time on Monday, October 9, 1972, and since the

letter refers to a meeting between the two ("After I left you last night . . ."), there can be little doubt about what conversation is being discussed.

**71.** Tr. E–77–80, 89–91.

Blackwell's first trip to Great Oaks and within a day or two of Mallan's initial trip. Further, the letter discussed proposals by the defendant on the procedure for setting up a corporation to run the resort and possible negotiating tactics in dealing with Russell, the owner of the property. (GX–91; GX–35) As in *Wolfson,* Mallan brought the letter to subsequent meetings with the defendant at Great Oaks. The letter was placed on the table and formed the basis for discussions among the three men as to how to set up the corporation and to divide the stock. These discussions, by analogy to *Wolfson,* can be viewed as oral modifications of the letter. Finally, the defendant never indicated to Mallan and Blackwell either that he had not mailed the letter or that he had not caused it to be mailed. (Tr. E–87–91) Therefore, the Court finds that there was sufficient evidence to support the verdict of the jury on Count I.

### 2. *Count II*

■ The defendant's contentions concerning Counts II and III similarly focus on the sufficiency of proof of mailing. The issue, however, arises in a context slightly different from Count I. Proof of the mailing of the letters which form the basis for Counts II and III involved proof of the office practice of the businesses involved, Mallan's office in the case of Count II and Delcher's office at Farmers Bank in the case of Count III.

The letter in Count II (GX–37) was drafted at the request of the defendant to provide him with written proof of his authority to act on behalf of Mallan in the purchase of Great Oaks. (Tr. E–113) [72] Mallan testified that he gave the letter to his secretary and directed her to mail it to the defendant at the address printed at the top of the October 10th letter. (GX–91) (Tr. E–116–19) Mallan further testified that he had given his secretary letters to mail on other occasions and that she had never failed to carry out his instructions. (Tr. E–118) The secretary did not testify.

**72.** Blackwell testified that Mallan and he drafted virtually identical letters of authorization. The ostensible purpose was to assure Russell

The Court in *Wolfson* recognized that circuits have differed on the issue of what circumstantial evidence of mailing is sufficient when the witness does not mail the item personally. Some courts require evidence of the business's ordinary procedure for mailing, but do not require that the mail clerk testify. Mailing is presumed from the proof of custom. *See, e. g., United States v. Joyce,* 499 F.2d 9, 15, 17 (7th Cir.), *cert. denied* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). Other courts require the testimony of the mail clerk that he either actually placed the letter in the mails or that it was his custom to deposit a letter left in a certain receptacle in the mails and that he never varied from this custom. *See, e. g., United States ex rel. Helmecke v. Rice,* 281 F. 326, 331 (S.D.Tex. 1922).

In the *Wolfson* case, the Court applied the stricter test of requiring the testimony of the mail clerk. If the record in the case at bar demonstrated that Mallan's business were not a large operation and that his secretary was the person who actually mailed the letter, that evidence might provide an adequate basis for abandoning strict adherence to the *Wolfson* holding. The Government, however, did not produce such evidence. Since the secretary responsible for placing GX–37 into the mails did not testify, there is insufficient proof of mailing. The defendant's motion for a judgment of acquittal on Count II of the indictment will be granted.

### 3. *Count III*

■ The letter (GX–36) which forms the basis for Count III of the indictment is a letter to Blackwell from Delcher which accompanied the financial statement form Blackwell requested. (Tr. D–45, 48–9) The Government introduced evidence to prove that the letter had been mailed. In contrast to GX–37, Delcher's secretary, Anne Smigelski ("Smigelski"), did testify that she

that the defendant had authority to act on behalf of Mallan and Blackwell (Tr. D–66).

typed GX–36 and signed it on behalf of Delcher. (Tr. G–125) She also testified that, pursuant to her invariable custom, she either placed it in the mail basket on her desk or carried it to the mail room at Farmers Bank. (Tr. G–126–28) On cross-examination, Smigelski admitted that she did not have any present recollection of mailing the letter, but that she "must have." (Tr. G–131) The obvious effect of this admission is to transform direct evidence of mailing into circumstantial evidence, but that transformation is not necessarily fatal. *United States v. Fassoulis*, 445 F.2d 13, 17 (2d Cir.), *cert. denied* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 100 (1971); *United States v. Wolfson, supra*, 322 F.Supp. 813–14. Construing the testimony and reasonable inferences most favorably to the Government, Smigelski's testimony is that if she were to mail a letter, she would follow the procedure she described, but that she had no recollection of actually placing it in the basket for mail or of delivering it to the mail room. In any event, the Government did not produce as a witness the individual in the Farmers Bank responsible for emptying Smigelski's mail basket and placing the contents in the mail or the person responsible for mailing letters delivered to the mail room.[73] The Government did put on the witness stand the former Assistant Treasurer of Farmers Bank in charge of mailing operations, Robert P. Corrie, Sr. ("Corrie"). Corrie testified that he supervised the collection of mail from the various offices at Farmers Bank and that the practice of his office was to have the mail brought to a central location for weighing, postmarking and delivery to the Post Office. (Tr. J–78–80)

Defendant's position is that the Government must produce the mail clerk who actually picked up the letter and placed it in the mail in order for the circumstantial evidence to give rise to an inference of mailing. I do not think that *Wolfson* establishes such a strict rule. Further, the statute does not require so exclusive a method. *Cf. Leasing Associates, Inc. v. Slaughter & Son,*

*Inc.,* 450 F.2d 174, 179–80 (8th Cir. 1971), and cases cited therein. One circuit has held as sufficient proof of mailing the testimony of an executive describing the office practice, without any testimony by any person actually involved in placing the letter in the mails. *See United States v. Joyce, supra,* 499 F.2d at 15–16. The *Joyce* standard was rejected by the Court in *Wolfson* as inadequate and this Court agrees that a stricter standard is necessary. In the case at bar, the Government produced the testimony of the secretary who typed and signed the letter and addressed the envelope and the testimony of the individual who supervised the mail operations at Farmers Bank. Thus, the proof of mailing consisted of much more than a description by an executive of what he understood the office practice to be. The testimony was elicited from two persons with direct knowledge of the mailing procedure and each testified to the unvarying practice of the office.

Obviously the questions of proof required to demonstrate that an item was mailed will vary somewhat in different cases. This opinion does not purport to establish a new standard of sufficiency. This Court holds that the proof offered to show that GX–36 was placed in the mails satisfied the test set out in the *Wolfson* case and was sufficient for a jury to find that the letter was mailed.

The defendant also contends that since the dates on GX–36 and financial statement completed by Blackwell (GX–43) are the same (October 25, 1972), the most likely inference is that the letter enclosing the form was not mailed. This contention fails for two reasons. First, having already ruled on the sufficiency of the proof of mailing, the question of what inference is most likely or most reasonable is outside the scope of defendant's motion. It is for the jury to determine credibility and to weigh the evidence. *See Pritchett v. United States,* 87 U.S.App.D.C. 374, 185 F.2d 438,

---

73. Smigelski could not have mailed the letter herself since she testified that she never put postage on letters. Tr. G–131.

439 (1950), *cert. denied* 341 U.S. 905, 71 S.Ct. 608, 95 L.Ed. 1344 (1951).

Second, the defendant neglects to refer to other parts of the record, besides the testimony described above, that support the inference of mailing. For example, Blackwell testified that he did not know whether he had predated or postdated GX–43, the financial statement. (Tr. D–102) Further, Blackwell testified that after the dinner meeting in New York during the week of October 22, 1972, the defendant spent the night with him. The following morning, the defendant accompanied Blackwell to his bank in New York and was handed two checks drawn in the amounts agreed upon at the meeting held the evening before. After receiving the checks, the defendant left. (Tr. D–69) The checks drawn against Morgan Guaranty Trust Company (GX–39, 40) reflect that they were issued on October 25, 1972.

The defendant's theory clearly is that the authorization letters (GX–37, 38) and financial statement letter (GX–36, 43) from Delcher were exchanged at the same time, purportedly at the meeting in New York. Since the Blackwell checks were dated October 25th and were drawn the day after the meeting, that meeting must have occurred on October 24, 1972. But, GX–36 was typed by Smigelski on October 25th. A jury could properly conclude it was impossible for defendant to have carried GX–36 and GX–43 to the meeting on October 24th. Obviously, the issue is properly one for the jury and not for speculation by counsel or the Court. The defendant's motion for a judgment of acquittal on Count III will be denied.

### 4. *Count V*

█ Count V of the indictment charges the defendant with inducing Mallan and Blackwell to travel from New York to Great Oaks in Maryland on November 4, 1972, by means of false representations in the execution of a scheme or artifice to defraud each of property having a value in excess of $5,000. 18 U.S.C. § 2314. The first ground in support of the defendant's motion is that there was no scheme. The scheme to defraud has been described above and does not require repeating here.

The second argument of the defendant is that since the money passed from the victims to the defendant no later than November 3, 1972, the scheme, if there was one, had been completed prior to November 4th. This argument presupposes that the purpose of the scheme was simply to fleece Blackwell and Mallan of approximately $45,000. I do not think that the evidence demonstrates so simple a scheme. Were this the common case of a person offering some worthless product in exchange for money, the defendant's argument might be more compelling. But as has been noted earlier, the scheme proven in this case did not involve the exchange of submerged land for money. Undisputably the Great Oaks property is valuable. The fraudulent scheme consisted of the defendant's misrepresentations, especially as to his wealth and hotel experience, to convince Mallan and Blackwell to invest in the property. Clearly, as of November 4, 1972, the scheme contemplated the continued association of the three men and additional investments. The money deposited as of November 3rd constituted only the initial down payment and operating capital. (Tr. E–99–100) Further, there was nothing to indicate that the subsequent dissolution of the partnership would occur. Accordingly, the Court finds that there was sufficient evidence for the jury to convict the defendant under Count V. The motion for judgment of acquittal on Count V will be denied.

### III. *Motion for New Trial*

As an alternative to the motion for a judgment of acquittal, the defendant has moved for a new trial. F.R.Crim.P. 33. The defendant cites numerous grounds in support of this motion.[74]

---

**74.** Several of the grounds asserted in defendant's opening and reply briefs were withdrawn by counsel at argument; Opening Brief (7); Reply Brief (5), (8), (9).

## A. *Prejudicial Publicity*

 The defendant urges that the Court erred in refusing to grant a change of venue due to the prejudice created by several newspaper articles one of which directly concerned the defendant and appeared in the Saturday paper immediately prior to the Monday the trial commenced. The defendant has not cited where his motion for a change of venue appears in the trial transcript and the Court's review indicates that the only motion made was for a postponement of the trial. (Tr. A–4) Consequently, the contention of the defendant will be treated as being based on the refusal to continue the case.

The news article which appeared before trial reported certain events surrounding the seizure of the defendant's automobile by Internal Revenue Agents.[75] The defendant's argument is devoid of any citation to the record in support of his claim of prejudice due to pre-trial publicity and similarly neglects to refer to any case establishing the legal standard which the Court is alleged to have violated. The Third Circuit in *United States v. Barber*, 442 F.2d 517, 519 (3d Cir. 1971), applied the standard announced in *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966): "Where there is reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."

At the time of the initial application by defendant, I was unconvinced that such a likelihood of prejudice existed and chose instead to rely on the *voir dire* of the jury panel to determine whether a continuance was warranted. (Tr. A–6) After individually examining in chambers, in the presence of both counsel, each prospective juror who indicated knowledge of the article and permitting defense counsel wide latitude in conducting his own *voir dire* during these examinations, the Court concluded that the defendant had failed to establish either that the article rendered a fair trial impossible or that the extensive *voir dire* was inadequate to protect the rights of the defendant. *See United States v. Barber, supra,* 442 F.2d at 529. That finding is reaffirmed.

The defendant also relies on the prejudicial effect of a series of news articles about the Farmers Bank which was published during the course of the trial. It is the law of this Circuit that under these circumstances, a new trial is required only when substantial prejudice has been shown. *See United States v. D'Andrea*, 495 F.2d 1170, 1172 (3d Cir.), *cert. denied* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974). As with the claim of pretrial publicity, the defendant does not cite specifically any portion of the record to substantiate the claim of prejudice.

What the record does reflect is that each time the jury was excused to go to lunch and to go home at the end of a day, the Court gave a quite detailed instruction cautioning against discussing the case with anyone or reading any articles or listening to any broadcasts about the case. Further, the jury was instructed to inform the Court if any of the prohibitions were violated.[76]

The record also shows that on each occasion the existence of a possibly prejudicial article was brought to the attention of the Court, steps were taken immediately to assess whether the jury had been tainted. On several occasions, the Court directed a general *voir dire* question to the jury to determine if any juror had seen the article, on the theory that if any juror responded affirmatively, an individual examination in chambers would take place.[77] On at least one occasion, the Court conducted an individual *voir dire* of each member of the jury without any preceding general question.[78] The *voir dire* was always conducted in the presence of both counsel.

---

**75.** DX–1 admitted· at hearing on motion for continuance.

**76.** *See,* e. g., Tr. B–136.

**77.** *See,* e. g., Tr. H–4–5.

**78.** Tr. F–3, *et seq.*

In the absence of specific references to the transcript, it is difficult to evaluate precisely where the prejudice is supposed to have occurred. This is especially true since the series of articles concerned the Farmers Bank and the defendant's name was never mentioned. Delcher's name was mentioned in a few places, but he was referred to in connection with a transaction unrelated to anything in the instant case. My review of the record serves to reaffirm my conviction at trial that the defendant has failed to demonstrate substantial prejudice and that a new trial is not required. *See United States v. D'Andrea, supra,* 495 F.2d at 1173.

### B. *Composition of the Jury Panel*

The defendant alleges that a new trial is warranted because 24 of the 47 jurors composing the panel had returned guilty verdicts in five trials during the preceding two months, whereas 70 other persons on the jury list who were not called had not been involved in any of the five trials. Again, the defendant's bold assertions of error are unaccompanied by any references to case authority. The defendant's cryptic complaint is that the jury panel violates the "intent and spirit of 28 U.S.C. § 1861–67 . . . ." (Defendant's Opening Brief at 10)

■ The Court finds it difficult to determine whether the defendant is challenging the particular jury panel called for his case or the system by which panels are selected. The defendant has produced no evidence indicating the intentional exclusion of a distinctive group in the community. *See Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Indeed, he has not even suggested why the group he is challenging constitutes a cognizable, distinctive group in the community. Further, if the defendant is alleging failure to comply with the federal statute, he has failed utterly to specify the violation. *See* 28 U.S.C. § 1861 *et seq.* The bare characterization "intent and spirit" is not very instructive. A defendant is not entitled to a jury of a particular composition so long as the selection process does not systematically discriminate against "distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor v. Louisiana, supra,* 419 U.S. at 538, 95 S.Ct. at 702. The defendant here has not sustained his burden of establishing a prima facie case of systematic exclusion of a distinctive group. *See Government of the Virgin Islands v. Navarro,* 513 F.2d 11, 19 (3d Cir.), *cert. denied* 422 U.S. 1045, 96 S.Ct. 2662, 45 L.Ed.2d 698 (1975).

■ Constituting the defendant's argument most favorably to him, one could treat his complaint as an allegation of bias and prejudice, based on prior service. A similar challenge was raised and rejected in *Calderon v. United States,* 269 F.2d 416 (10th Cir. 1959). Indeed, the appellant in *Calderon* based his contention on the then existent 28 U.S.C. § 1869 which concerned the frequency of service by jurors and which was repealed in 1968. *See* Act of October 16, 1963, Pub.L.No. 88–139, § 2, 77 Stat. 248, *as amended,* 28 U.S.C. § 1869 (1970). The defendant in the instant case has not referred to statutory authority in support of his bias claim. Moreover, the defendant has not made any showing that the jurors in question were biased. *Cf. United States v. Cooper,* 332 F.2d 790, 791 (3d Cir. 1964). Accordingly, the defendant's motion for a new trial based on the composition of the jury panel will be denied.

### C. *Admission of Damm Testimony*

The defendant contends that the Court erred in admitting the testimony of Dr. Robert D. Damm ("Damm") and the prejudice caused thereby requires a new trial. The defendant asserts two grounds in support of his allegation of error: (1) F.R.E. 404(b) does not permit the introduction of subsequent similar acts under any circumstances; (2) Even if arguably admissible, the prejudice resulting from its admission far outweighs any probative value. *See* F.R.E. 403.

■ Rule 404(b) does not by its terms exclude subsequent similar acts. It speaks only of "other crimes, wrongs, or acts,"

without distinguishing between prior or subsequent. Likewise, the Third Circuit has held in several cases decided prior to the passage of the New Federal Rules of Evidence that evidence of similar acts committed after the one for which the defendant is being tried is admissible if the evidence is relevant and is not introduced to show the propensity of the defendant to commit the crime. *See United States v. Laurelli*, 293 F.2d 830, 832 (3d Cir. 1961), cert. denied 368 U.S. 961, 82 S.Ct. 406, 7 L.Ed.2d 392 (1962); *United States v. Stirone*, 262 F.2d 571, 576 (3d Cir. 1958), rev'd on other grounds 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The Third Circuit has determined that the new Rule 404(b) is "substantially the same as that previously applied in this Circuit." *United States v. Dansker*, 537 F.2d 40, 57 and n.10 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Therefore, the Court finds no merit in the defendant's contention that subsequent similar acts are never admissible under Rule 404(b).

Even if the evidence is relevant and otherwise admissible under Rule 404(b), the Court in its discretion may exclude it if the Court finds that "the probative value of such evidence is substantially outweighed by the risk that its admission will create a substantial danger of undue prejudice." *United States v. Stirone, supra*, 262 F.2d at 576–77.

■ The Court during trial found the testimony of Damm relevant and not unfairly prejudicial. (Tr. G–24) The testimony of Damm did not constitute evidence of another crime. So far as the Court is aware, the defendant was never accused of or prosecuted for any incident involving Damm. The Court admitted the testimony of Damm to permit the Government to rebut the defendant's contention in the opening statement to the jury that no crime had been committed in the course of the Great Oaks transaction, that what had happened was at most a bad business deal. (Tr. B–

130–31; G–18) The clear inference of the defendant's statements was that the defendant had no intent to deceive and had not misled Mallan and Blackwell into investing in the deal. The Damm testimony was probative in demonstrating that the statements about his wealth and business experience made by the defendant were not made accidentally or inadvertently. Important to this determination were the facts that the misrepresentation to Damm occurred on December 25, 1972, very closely in time to the Great Oaks events and that several of the same assertions made to Blackwell and Mallan were made to Damm. (Tr. G–9–10) Further, the testimony provided additional evidence of the close relationship between Delcher and the defendant. (Tr. G–10–12)

In addition to the similarity in representations and the temporal proximity, the testimony of Damm was probative in supporting the Government's theory that the defendant used these representations to allay suspicions about him and to encourage trust and confidence in him. Although the misrepresentations made to Damm were not all identical to those made to Mallan and Blackwell, the Damm testimony helped to establish a modus operandi used by the defendant when seeking investments from others.[79] *See United States v. Dansker, supra*, 537 F.2d at 58.

Concededly, the danger exists in any case involving similar acts that a jury may misuse evidence introduced for a limited purpose. In the instant case, the Court took care to avoid any possible prejudice. Prior to permitting Damm to testify, the Court held an extensive hearing to consider the Government's proffer of the testimony. (Tr. F–164–205) Moreover, prior to any substantive testimony by Damm, the Court gave a very explicit cautionary instruction explaining to the jury precisely the purposes for which they may and may not consider the testimony. (Tr. G–5–6) It is the finding of this Court that the possible

---

79. Some of the representations concerned the defendant's relationship with Mallan and Blackwell. The vast weight of the testimonial and documentary evidence introduced at trial blatantly contradicted these representations.

prejudice of the Damm testimony to the defendant did not substantially outweigh the probative value. *United States v. Stirone, supra,* 262 F.2d at 576–77.

### D. *Admission of GX–103*

■ The defendant has moved for a new trial on the ground that the Court erred in admitting GX–103, a document which attests to the fact that the assets of CINA were sold at a Sheriff's sale to satisfy a judgment entered in favor of David R. Copley ("Copley") against CINA. The gravaman of the defendant's contention is that the Court previously had excluded the testimony of Copley when offered by the Government as evidence of a prior similar act. F.R.E. 404(b). By permitting the limited testimony of Copley and the introduction of GX–103, the defendant alleges that the prosecution accomplished indirectly what it was barred from accomplishing directly.

The defendant's argument substantially misses the point. The Government originally offered the Copley testimony as evidence of a prior similar act of fraud, admissible under F.R.E. 404(b). (Tr. E–177–82) After hearing the Government's proffer of evidence, the Court excluded the testimony of Copley concerning his investment in CINA and the alleged fraud committed by the defendant. The Court, however, specifically noted that it was not barring testimony by Copley about the financial status of CINA. (Tr. E–186–87) The ruling excluded only Copley's testimony about the events surrounding his investment.

Copley did not testify about his loan transactions with the defendant nor was there any mention of fraud or any other wrong doing on the part of the defendant.

He testified about his employment with CINA and gave a general description of its offices and business purpose. (Tr. G–36–40) The Government offered his testimony and GX–103 to show by inference that the defendant's representations about his successful computer business were false.

The defendant claims substantial prejudice resulted from the introduction of GX–103 because the vendex reflects that the Sheriff's sale was held to satisfy a judgment Copley was awarded against CINA in the amount of $100,000. The Court finds the claim unconvincing. The record is simply devoid of any theory to support the contention that the evidence shows a prior similar crime or other wrongful act. The evidence reflects a debt to Copley which CINA was forced to satisfy partially by selling its physical assets. There is no evidence about the basis for the debt or any of the surrounding circumstances. The gloss the defendant seeks to place on the Copley testimony and GX–103 is not supported by anything in the record. Moreover, the prejudicial effect of the evidence, if any, was outweighed by its probative value in establishing that CINA was not a successful business. The motion of the defendant for a new trial based on the Copley testimony and GX–103 will be denied.

### E. *Blackwell Testimony*

■ The defendant has asked for a new trial based on two statements made by Blackwell in the course of his testimony. One statement concerned the defendant's "problems" with the Internal Revenue Service.[80] The second ground concerns Blackwell's reference to a "bounced check" given to him by the defendant.[81]

> "MR. KIMMEL: May we approach the bench?
> "THE COURT: Yes." Doc. 57C at C–179.

**80.** The transcript of the statement is as follows:

> "Q Do you recall during that time whether he mentioned any specific figure regarding his income?

> "A Well, again, Mike's income, you know, was always in the six figures. He would always talk about it. As a matter of fact, I remember him talking about the IRS one time, gee, he was having problems with the IRS on—

**81.** The transcript of the statement is as follows:

> "Q And after you deposited that check, what if anything unusual happened to your checking account?
> "MR. KIMMEL: Objection. Leading.
> "THE COURT: Overruled.
> "THE WITNESS: The check bounced.

The reference to the defendant's "problems with the IRS" came in response to a question about the defendant's representation as to his income. The prosecution obviously could not have anticipated that the witness would go beyond the simple answer to his question and speak about the Internal Revenue problems. The record reflects that the Government did not attempt to circumvent the Court's prior ruling that evidence of the defendant's 1973 conviction for violating 26 U.S.C. § 7203 was inadmissible.[82]

As the Supreme Court has noted "instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). This is certainly one of those instances. The testimony was unexpected. It comprised one sentence in Blackwell's testimony which covers 159 pages in the transcript. The reference to the prejudicial matter was very general ("problems") and was never fully developed because of the defendant's objection and the prosecution's abandonment of the line of questioning. Finally, the Court offered to give a cautionary instruction to the jury to disregard the statement but the defendant declined. (Tr. C–180–81) In the context of the witness's testimony and the factors noted above, the Court cannot perceive any prejudice which warrants a new trial.

The reference to the check bouncing constituted inadmissible hearsay. Again, however, the transcript reflects that the Government was not attempting consciously to sneak in inadmissible testimony. As a result of the statement, the Court, after hearing from both parties, gave a cautionary instruction to the jury directing them to disregard the answer.[83] "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instruction. . . ." *Bruton v. United States*, *supra*, 391 U.S. at 135, 88 S.Ct. at 1627. Generally, the harm caused by inadmissible hearsay can be corrected by striking the testimony and admonishing the jury to disregard it. *See United States v. Rojas*, 537 F.2d 216, 222 (5th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). This Court finds that the deletion of the testimony and the explicit instruction and explanation given to the jury served to cure whatever harm may have been done by the introduction of the evidence. The motion for a new trial based on Blackwell's testimony will be denied.

### F. Admission of the Post-November 22, 1972 Documents

█ The defendant contends that a new trial should be ordered because the Court erred in admitting documents which indicated how the money put up by Blackwell and Mallan was used by the defendant and Delcher after November 22, 1972, the date the defendant gave Mallan and Blackwell a promissory note in the amount of $90,000 to buy out their interest in Great Oaks.

At bottom, defendant contends that the post-November 22 documents were irrelevant and prejudicial. Initially, it should be noted that the defendant may have waived his right to raise this objection. The objection was raised prior to the admission of the documents and then raised again after

---

"MR. KIMMEL: If it please the Court, may we approach the bench?" Doc. 57D at D–86.

**82.** It should be noted that the defendant was indicted on July 11, 1972, and convicted on April 23, 1973. At the time of the conversation, Blackwell was discussing the defendant may have been indicted, but certainly had not been convicted.

**83.** The transcript of that statement is as follows:

"THE COURT: Members of the jury, I am instructing you to disregard the last answer of this witness that the check bounced. I believe that was the witness' words. The reason that I am instructing you to do that is that that is hearsay. I've inquired of the Government at this bench conference whether they can establish through independent evidence that in fact that happened, and they cannot, and therefore the testimony that the check bounced should not be before you. You should not consider it. Now, is that clear to all of you?

"Let the record reflect every juror is nodding yes." Doc. 57D at D–89.

Weiss completed his testimony. In response, the Court refused to permit the documents to be used for the purposes contended by the Government, but found the documents relevant to certain specific issues. Accordingly, the Court gave a cautionary instruction to the jury limiting the purpose for which the documents and testimony could be used. The defendant approved the instruction and expressed his satisfaction with it. (Tr. J–57) Whether his statements and actions constituted a waiver is a rather perplexing problem, but its resolution is unnecessary in this case.

The post-November 22 evidence was relevant to show exactly what happened to the funds put up by Blackwell and Mallan. Concededly, this proof may not have been essential to meet the statutory elements of the offenses of conspiracy and mail fraud. See 18 U.S.C. §§ 371, 1341. The evidence was necessary, however, to demonstrate that Mallan and Blackwell had not been paid back for their investment.

The Government adopted two methods to prove the nonpayment. First, it introduced through the testimony of Mallan evidence that he (Mallan) had never received payment on the promissory note. (Tr. E–134–35) Second, it used the documents and explanatory testimony of Weiss to show that the defendant had not returned the actual funds given by Mallan and Blackwell. The documents indicate that the money was used as collateral to secure loans by the Farmers Bank to the defendant in 1973. The likelihood of the defendant's arguing to the jury that there was no evidence of non-payment was noted by the Court during trial and was confirmed by the defendant's contention in his opening brief. (Defendant's Brief at 19) Although the documents were not relevant as independent proof of the conspiracy between Delcher and the defendant, they were relevant to prove that the funds were not returned to their source. Thus, the Court instructed the jury on the proper use of the testimony. The instruction, approved by the defendant, was given immediately after Weiss completed his testimony and was given again in the final charge to the jury. (Tr. J–55–57, L–103–4)

In the context of a subtle and somewhat complex fraud and conspiracy case, a district court has substantial latitude in determining the relevance and admissibility of evidence. See United States v. Baumgarten, 517 F.2d 1020, 1029 (8th Cir.), cert. denied 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975); United States v. American Radiator & Standard Sanitary Corp., supra, 433 F.2d at 203. With the precision of hindsight, the Court now perhaps could suggest ways to abridge the lengthy testimony of Weiss, but those possible short cuts were not foreseeable prior to the testimony. (Tr. J–47) The evidence was relevant and in the exercise of its sound discretion, this Court does not find the possible prejudice, if any, of admitting the evidence outweighs its probative value, especially in light of the careful limiting instruction twice given to the jury. The defendant's motion for a new trial based on the admission of the post-November 22 documents will be denied.

### G. Other Prior Similar Acts

The defendant has moved for a new trial based on the admission of evidence of other prior similar acts introduced through the testimony of Widing, Hoogland and Gordon Pfeiffer ("Pfeiffer"). The Court finds no merit to these contentions.

The defendant cites three statements made by Widing as evidence of prior similar wrongful acts: (1) Widing's reference to the defendant's statement that he (the defendant) "laundered money" in Puerto Rico;[84] (2) Widing's testimony that the de-

---

**84.** The transcript of that statement is as follows:

"Q At the point where you are talking about Great Oak, what if any other representations did Mr. Sinclair make concerning his financial background?

"A Concerning his financial background, he referred to the fact that he had to launder money, in other words, take it to Puerto Rico, to the Golden Beach Hotel operation which he owned, and bring it back into this country in some way that it would be advantageous

fendant had described a procedure for "keeping money" by forming a corporation and subsequently declaring bankruptcy and that this activity was illegal;[85] (3) Widing's testimony that he informed Mrs. Mallan and Mrs. Blackwell that he had not been involved with the defendant in other business transactions.[86]

The testimony about laundering money in Puerto Rico was clearly relevant. It formed a part, albeit small, of the Government's proof of the defendant's misrepresentations about his wealth. Further, the answer included a statement by the defendant that he owned the Golden Beach Hotel. The term "laundering money" may give rise to several different interpretations, but the witness went on in his answer to explain what he means by the term. Widing described what seems a perfectly legal procedure: taking money from investments in

this country and putting it in a hotel operation in Puerto Rico and then reinvesting it in the United States. Any ambiguity remaining was properly a subject for cross-examination. This Court finds that the statement was relevant, was not evidence of a prior similar act and that the minimal prejudice, if any, was far outweighed by the probative value of the evidence.

The testimony about the use of bankruptcy to retain earned profits is a little more troublesome. As the record reflects, the Court relied on the Government's representation that the witness would testify that the defendant considered it a legal business practice. Widing then testified to exactly the opposite. The Court, however, acted promptly to cure any possible prejudice. (Tr. C–49) These events are an apt example of inadmissible evidence inadvertently creeping in. *See Bruton v. United States,*

---

for him to invest in Great Oak." Doc. 57C at C–34.

**85.** The transcript of that statement is as follows:

"Q Do you recall any of the discussions you had concerning his business techniques?

"A Yes. At our dinner table—

"MR. KIMMEL: Objection, irrelevant.

"THE COURT: Overruled.

BY MR. BEAM:

"Q What was that discussion?

"A Mr. Sinclair mentioned that there were many opportunities in business today and the problem wasn't making money, it was keeping money, and it was necessary from time to time to form different corporations and later on down the road to declare bankruptcy in these corporations and take whatever profits could have been gathered before this happened.

"MR. KIMMEL: May we approach the bench?

"THE COURT: Yes.

(The following occurred at side-bar:)

"MR. BEAM: Your Honor, if I could speak, I think I could clarify a problem. If the witness will be permitted to continue, he is going to say that Mr. Sinclair told him in the same conversation that the IRS approved of this and this was OK. . . . "

* * * * * *

BY MR. BEAM:

"Q Now, when you had this particular conversation, did Mr. Sinclair indicate whether this was a proper procedure?

"A An acceptable procedure.

"Q And why was that?

"A Because that seemed to be his standard of operation, that it was successful and acceptable.

"Q What if anything did he say with regard to Government agency's recognition of this procedure?

"A Well, that it was illegal, the implication was, that it was illegal.

MR. KIMMEL: May we approach the bench?" Doc. 57C at 46–48.

**86.** The transcript of that statement is as follows:

"Q Do you recall the conversation?

"A In the course of our conversation it became evident to Mrs. Mallan, Mrs. Blackwell and myself that there was misinformation or information that was not the same that had been given to us separately.

"Q And what was that information?

"A The information was that I had been involved with Mr. Sinclair before in transactions and that they had been involved with Mr. Sinclair previously in business transactions.

"MR. Kimmel: May we approach the bench?"

* * * * * *

BY MR. BEAM:

"Q What did you tell Mrs. Mallan and Mrs. Blackwell?

"A I told Mrs. Mallan and Mrs. Blackwell that I had never been previously involved with Mr. Sinclair in any transaction whatsoever or any business.

"Q How did they act when you said that?

"A They were surprised." Doc. 57C at C–51–52.

*supra,* 391 U.S. at 135, 88 S.Ct. 1620. Any prejudice, however, was cured by the immediate instruction to the jury to disregard the answer.

The defendant's reliance on the third statement by Widing as a ground for a new trial is utterly specious; it does not even have the surface appearance of merit that the other two have. Widing testified that the Blackwells and Mallans had been led to believe incorrectly that he and the defendant had been involved in other business deals, besides Great Oaks. There was no testimony about the legality of these deals or of the defendant's actions in them because they simply never occurred. (Tr. C–52) It is not the duty of this Court to extrapolate from the cryptic descriptive reference in defendant's brief how this testimony constitutes evidence of a prior wrongful act when the testimony is that the defendant and Widing had never been involved in any other deals. The Court finds the defendant's claim of prejudice baseless.

The defendant also has cited a portion of Hoogland's testimony as justification for a new trial.[87] The testimony at issue came out as the Government was attempting to prove that the defendant did not own the Golden Beach Hotel and in fact had failed in a bid to acquire it. The Court previously had made clear to all concerned, including the witness, that Hoogland could testify only to the attempt to purchase the hotel and the failure of that attempt. (Tr. D–169–70) The point of the ruling was to ensure that no prejudicial irrelevant testimony was introduced inadvertently.

The testimony which the defendant finds sufficiently prejudicial to warrant a mistrial consists of Hoogland's stating where the attempted purchase occurred and one person, an attorney, who was present at the meeting. At that point the Court cut off the witness's answer, held a brief side-bar conference and the prosecution moved to a new topic. (Tr. E–15–16) The record demonstrates that absolutely no prejudice was suffered by the defendant. The two answers may have been irrelevant, but they were not prejudicial. Indeed, the Court acted sua sponte to truncate the questions in order to avoid any prejudice.

Finally, the defendant relies on a statement by Pfeiffer that not all students who had enrolled in courses of CINA received the education they had been promised.[88] At trial, the defendant remained silent during the answer at issue here and only belatedly, after another question had been asked and answered, was an objection raised. Nevertheless, the Court in the exercise of its discretion considered the objection and promptly ordered the jury to disregard both answers. (Tr. G–59–60) Subsequently, in another context, the Court specifically informed the jury that as a matter of fact none of the students at CINA had lost any money or any of the benefits to which they were entitled. (Tr. G–112) Although part of the responsibility for the testimony having been introduced may rest with the defendant, this Court finds that the two instructions given to the jury removed any possibility of prejudice to the defendant. The Court did more than order the testimony stricken and disregarded. It specifically told the jury that the information was not

87. "Q You referred to a meeting; where did this meeting take place?
 "A You mean—
 "Q With regard to the attempted purchase of the hotel.
 "A In New York.
 "Q Who was present?
 "A Mr. Rosenbaum, the attorney—
 "THE COURT: May I see counsel at the Side Bar, please?" Doc. 57E at 14–15.

88. "Q Now, what if any connection did Mr. Delcher have with CINA?

"A Only as a bank officer dealing with the students, to the best of my knowledge, or dealing with the loan accounts.
 "Q And what happened to those loan accounts, if anything, in 1970 or 1971?
 "A I don't know the exact date, but I know that Mr. Delcher was given the responsibility of working with those students that we had financed, that had not been provided the education as called for.
 "Q That is education with CINA?
 "A With CINA, yes.
 "MR. KIMMEL: May we approach the bench?" Doc. 57G at G–56.

true. Under these facts, the Court's action adequately protected the defendant against unfair prejudice.

Accordingly, for the reasons stated above, the defendant's motion for a new trial based on certain testimony by Widing, Hoogland and Pfeiffer will be denied.

### H. *Conduct of the Prosecutor*

█ The defendant seeks a new trial based on the misconduct of the Government's attorney, Mr. Beam ("Beam"). The specific incident urged as a sufficient ground for mistrial was characterized by the Court for the record:

> "THE COURT: The only thing I say in the way of actions which would not appear in the record was Mr. Beam becoming very emotional. He wanted a side bar and my recollection is that he gave a signal with his hand, pointing toward the side bar,—striding toward the side bar and then requested the side bar. Now, I don't condone Mr. Beam's remark as it appears on the record. On the other hand, I don't think it comes anywhere close to warranting a mistrial. I say that particularly because my distinct recollection is that the Jury was amused, and I am confident they were laughing at Mr. Beam, not with him. It had not to do with the content of what was said; that is why I asked you who was prejudiced.
>
> "It might have hurt the Government more than it hurt the defendant. I just don't see it. You can correct the record, or add to the record in any way you see fit."
>
> "MR. KIMMEL: I have nothing . ."

Doc. 571 at 69–70.

It should be noted that the motion for mistrial was not made at the time the incident occurred, immediately before the luncheon recess. Instead, the motion was made following the recess, an hour later. It is similarly important to note that this is not a case of the prosecutor making an inappropriate comment about a substantive issue in dispute, for example an opinion about the guilt of the defendant based on evidence outside the record. *See United States v. Schartner,* 426 F.2d 470 (3d Cir. 1970).

The Third Circuit has held that reversal of a conviction is proper only when the misconduct causes prejudice to the defendant. *See United States v. Somer,* 496 F.2d 723, 737 (3d Cir.), *cert. denied* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). This standard recognizes that prosecutorial conduct may be found improper but not prejudicial. *See, e. g.; United States v. Benson,* 487 F.2d 978 (3d Cir. 1973); *United States v. Leftwich,* 461 F.2d 586 (3d Cir.), *cert. denied* 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178 (1972).

As the Court noted at the time of the motion at trial, any prejudice resulting from the prosecutor's conduct inured to the Government, not to the defendant. (Tr. I–70) The transcript of this case does not reflect the bemused expressions on the faces of the jury caused by Mr. Beam's animated gestures. Certainly this Court does not condone or excuse emotional displays on the part of any attorney in a criminal case, albeit sometimes understandable in the context of a long and vigorously contested trial such as this. Nevertheless, the non-verbal conduct of the prosecutor at issue here simply was not so gross or inflammatory to warrant a new trial. *See United States v. Homer,* 545 F.2d 864 (3d Cir. 1976).

### I. *Newly Discovered Evidence*

█ In his opening brief, the defendant requested a new trial based on newly discovered evidence. On December 9, 1976, the Court held a hearing to permit the defendant to produce the evidence which purportedly was to show that Blackwell could not have been at Great Oaks on the weekend of October 21, 1972.

Briefly summarized, the defendant alleged that the Blackwells were members of a sailing group at the Larchmont Yacht Club in Larchmont, New York, known as the Dinghy Sailing Club. This group held a party on Saturday, October 21, 1972. The defendant's position was that the Black-

wells attended this party and that proof of their presence could be established through a bill in the amount of $75.39.

At the December 9th hearing, testimony from the Larchmont Yacht Club secretary and the records of that Club established that there was a Dinghy Party on October 21, 1972. The records did not indicate, however, that the Blackwells attended. Mrs. Blackwell testified that they were members of another sailing group at Larchmont but were not members of the Dinghy group. Moreover, the Larchmont secretary testified that members of the Club who attended the party were sent a monthly statement reflecting charges for food and drink incurred during that month. If the Blackwells had attended the party and charged the cost of the dinner, that charge would have been reflected in the October, 1972 statement. The billing records of the Yacht Club showed that no charges were assessed to the Blackwells during the month of October, 1972, for beverages or food.

Thus, the hearing produced no new evidence that the Blackwells were in New York rather than at Great Oaks on the weekend of October 21, 1972. The defendant did not produce a bill in the amount of $75.39 nor any other evidence of the Blackwells' attendance at the Larchmont party.

The only other possibly relevant evidence introduced at the hearing was the testimony of Delcher and a written report of an interview of Blackwell conducted by the Maryland State Police. (GX–1) Delcher testified that the first time he met Blackwell was at a cocktail party, which the trial testimony indicated was on November 4, 1972. This testimony does not lead inexorably to the conclusion Blackwell was not at Great Oaks on October 21, 1972; it only raises the possibility that Delcher was not there. The police report indicated that Blackwell stated he was at Great Oaks the weekend of "October 15 and 16." [89] Without deciding whether this constitutes newly discovered evidence within the meaning of F.R.Crim.P. 33, at best this evidence is merely cumulative of the evidence the defendant attempted to adduce from cross-examination that Blackwell was not at Great Oaks on October 21.[90] This evidence does not meet the standards either for a motion filed within seven days of the verdict or for a motion based on newly discovered evidence.[91] *See Brodie v. United States,* 111 U.S.App.D.C. 170, 295 F.2d 157 (1961); *United States v. Rutkin,* 208 F.2d 647 (3d Cir. 1953); *United States v. Barber,* 303 F.Supp. 807, 820 (D.Del.1961), *rev'd on other grounds,* 429 F.2d 1394 (3d Cir. 1970).

For the reasons stated above, the defendant's motion for a new trial based on newly discovered evidence will be denied.

### J. Cumulative Error

Finally, the defendant has moved for a new trial apparently on the basis of the cumulative effect of all the incidents cited individually as grounds for a new trial. The Court finds this contention as meritless as the individual grounds discussed above. Therefore, for all of the reasons discussed in this section of the Opinion, the defendant's motion for a new trial will be denied.

### IV. Conclusion

For the reasons stated above, the defendant's motion for judgment of acquittal on Counts II will be granted and will be denied on all other Counts. Further, the defendant's motion for new trial will be denied.

---

**89.** Reference to a 1972 calendar establishes that the most proximate weekend in October was the 14th and 15th.

**90.** *See, e. g.* D–129; E–54–56.

**91.** Defendant filed his opening brief within seven days of the entry of the guilty verdict. Although his brief refers to *United States v. Barber,* 303 F.Supp. 807 (D.Del.1969), as establishing the proper standard for review of the mo-

tion, that case concerned a motion based on newly discovered evidence submitted long after trial. Accordingly, this Court also has applied the less stringent test applicable to motions filed immediately after trial. *See Brodie v. United States,* 111 U.S.App.D.C. 170, 295 F.2d 157 (1961); *see generally* Wright, Federal Practice & Procedure: Criminal § 557 at 515 *et seq.* (1969).